FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 OCT 29 P 3:19

CLERKS OFFICE
AT BALTIMORE

BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES BLACKWELL, #224-824　　　　*
　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　*　CIVIL ACTION NO. RDB-13-372

KATHLEEN GREEN, et al.,　　　　　*
　　　　Defendants.

***

# MEMORANDUM OPINION

Plaintiff filed the above captioned civil rights complaint pursuant to 42 U.S.C. §1983 on February 1, 2013. ECF No. 1. Pending is Defendants Warden Kathleen Green, Lieutenant Walter Donaway, Lieutenant Henry Landon, Sergeant Donald Adams, CO II Antonio Henry, and CO II Danny R. Tavers' Motion to Dismiss, or in the alternative Motion for Summary Judgment. ECF No. 21. Plaintiff has responded.[1] ECF No. 25. Defendants have filed a reply and Plaintiff has filed a Surreply. ECF Nos. 26 & 27. Upon review of papers and exhibits filed, the Court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons follow the Motion to Dismiss, or in that alternative for Summary Judgment WILL BE GRANTED.

## Background

By way of supplemental complaint, the pro se,[2] Plaintiff, a Sunni Muslim assigned to protective custody status at the Eastern Correctional Institution (ECI), a state of Maryland Division of

---

[1] Also pending is Plaintiff's Motion to Appoint Counsel. ECF No. 24. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 779 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). Plaintiff has articulated his claim without notable difficulty and the claim is not unduly complex. The Motion shall be denied.

[2] As a self-represented litigant, Plaintiff is entitled to liberal construction of his pleadings. *See, e.g. Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519 (1972) (requiring liberal construction of pro se pleadings).

1

Corrections (DOC) facility, alleges that when he returned to his cell on January 14, 2013, "Jesus" was written on his cell door window. Plaintiff states that the officer working the tier, Officer Tavers, is an "outspoken Christian whom [he] had several debates with." ECF No. 3. He further alleges that on January 27, 2013, Tavers placed his hand on Plaintiff's left shoulder, "as if he's a faith healer" and said, "I can feel it." *Id.* Plaintiff interpreted this statement as meaning that since he is a Muslim the correctional officer was accusing him of being possessed. Plaintiff states that Tavers sang "Jesus songs" in front of his cell and made the symbol of the cross with his fingers on Plaintiff's cell door window.

Plaintiff states that on January 28 and 29, 2013, he gave administrative remedy procedure requests (ARPs) to the tier officer, Alan, who indicated he in turn gave them to the officer in charge, Defendant Henry. Plaintiff observed the tier officers reading his ARPs "in the bubble." Alan advised Plaintiff that Henry stated he could not sign the ARPs; rather, a supervisor needed to sign them. Plaintiff opines that Henry is Tavers' "Christian brother and [he] know[s] that is why he didn't sign them." *Id.*

On January 30, 2013, Plaintiff gave Lt. Landon ARPs. Landon told Plaintiff he would read and submit them. He states that he showed Landon the "Jesus on his cell door window." Plaintiff states that Landon never talked to Plaintiff about the ARPs or turned them in. *Id.*

Plaintiff states that on January 18, 2013 and February 1, 2013, he submitted ARPs to Warden Green. On February 1 and 9, 2013, Plaintiff states Sgt. Adams and Lt. Donaway, respectively, attempted to discourage him from pressing charges against Tavers and threatened to transfer him and/or to remove him from protective custody status. *Id.*

Plaintiff claims that during the religious period of Ramadan the prison does not run an early medication line, forcing him to go for 14-18 hours without pain and psychological medication as he

cannot take the medication during the fasting time. Plaintiff states that he suffer from post-traumatic stress disorder, two repaired knees, arthritis, and a "bad" lower back and left shoulder. *Id.*

Plaintiff states that every other Friday the prison is on a modified lock down and no recreation or showers are permitted. He claims that as a Muslim he is to take a bath or shower before the Friday Juma services. He also states that during Ramadan, which is observed in the summer, the prison passes out ice at 3:00 p.m but he cannot partake because he is fasting. Plaintiff states he wrote ARPs regarding these issues but they were dismissed. He appealed to the Commissioner but did not receive a response. *Id.*

Plaintiff also states that he complained to Donaway about the location of the religious service for Muslims but Donaway advised him that if he wanted to practice his religion the right way he should sign off protective custody. ECF No. 7.

Plaintiff indicates that was transferred from ECI to the Maryland Correctional Institution-Hagerstown (MCI-H). He states that he lost income as a result of the transfer and the move was malicious. ECF No. 10.

Defendants provide the following information:

A.     Religious Practices

In July of 2010, due to budget constraints, cost containment days were instituted at ECI. ECF No. 26, Ex. 1. The cost containment efforts addressing shower schedules and ice distribution rounds were undertaken to make the most efficient use of the movement of inmates and staff, thereby decreasing the amount of overtime needed to run the institution. On cost-containment days which occur on Fridays, 240 hours of overtime are saved. Defendants contend the savings are realized with minimal impact to inmate programming and activities and are the least restrictive means for furthering the goals of cost containment. *Id.*

3

Fazel Khattak, a Muslim Chaplain employed by the Department of Public Safety and Correctional Services, indicates that in 2012, the religious observance of Ramadan was celebrated from July 20 to August 19. ECF No. 21, Ex. 2. During Ramadan, under Islamic law, a Muslim is required to fast, completely abstaining from eating and drinking, from dawn to dusk. Medically necessary medications, however, do not require one to fast. Additionally, if one is sick, he is not required to fast and can take medication and/or ice any time. *Id.* The location of religious services in Housing Unit 5 complies with Islamic law, safety, security, and is within the program guidelines of the DOC for providing religious activities. Khattak further avers that showers taken as early as Thursday comply with Islamic law regarding preparation for Friday religious services. *Id.* Additionally, he notes that ritual cleansing can be accomplished by washing with water one's hands, face, and feet, and wiping the head. Plaintiff has access to running water in his cell. *Id.*

B.   Medication and Ice Distribution

Defendants aver that all medical care within the DOC is provided by contractual employees. Correctional employees have no authority to made decisions concerning medical care or order medical staff to perform any particular medical procedure or provide any particular procedure or medication. *Id.,* Ex. 3. Private medical and pharmacy staff go to the housing unit to distribute medication to inmates housed on protective custody. Medication distribution occurs twice daily between 7:00 a.m. and 12:00 a.m. when the institution is operating at full staffing capacity. Due to security concerns, limited medical staffing, and operational efficiency concerns, distribution of non-emergency medication does not occur from midnight to 7:00 a.m. *Id.,* Ex. 3

During the summer of 2012 outside recreation for inmates was modified when the heat index was between 100 and 105. *Id.,* Ex. 6. If the heat index was over 105, outside recreation for inmates could be cancelled. If outside recreation was canceled, ice was distributed by the day shifts in all

4

housing units, including the special housing unit where Plaintiff was housed. Plaintiff was able to take a cup of ice during distribution if he so chose. *Id.* The distribution of ice occurred during the day rather than at night because of the excessive heat during the day and was influenced by operational efficiency and security concerns. *Id.* Additionally, Plaintiff's housing unit distributed ice water in the recreation halls for all inmates at recreation periods. Ice and ice water was also distributed on the evening shift. Additionally, inmates in Plaintiff's housing area had access to the recreation area approximately six hours a day where ice and ice water was distributed. Plaintiff was provided a meal after sundown during Ramadan which included a cold beverage. *Id.*

C.   Harassment

Defendant Tavers avers that he did not write Jesus on Plaintiff's cell door. *Id.*, Ex. 6. In response to Plaintiff's complaint, Adams inspected the cell door but did not see Jesus written on it. *Id.*, Ex. 7. Tavers further states that he did not make the sign of the cross with his fingers at Plaintiff or touch Plaintiff and say "I can feel it." Tavers further states that he did not attempt to intimidate or harass Plaintiff by singing religious songs, or in any other manner attempt to intimidate or harass Plaintiff due to his religious affiliation. *Id.*

D.   Administrative remedies

ECI's policies regarding inmate grievances encourage the use of an informal process to expedite resolution of ARP complaints. *Id.*, Ex. 8. Defendants indicate that ECI staff endeavor to address complaints within five days of their receipt. If informal resolution fails, formal resolutions may be pursued. *Id.* The procedure for Plaintiff's housing unit requires that the completed ARP form be delivered by the inmate to the day shift Housing Unit Manager who will sign the ARP and issue the inmate the signed copy of the form. The Unit Manager reviews the ARP and conducts an interview to determine if the matter can be resolved. If it cannot be resolved and further investigation

is necessary the Unit Manager places the original copy of the ARP into the ARP box located on the tier before the end of the shift. The ARP coordinator picks up the ARP form on the next business day for processing. *Id.*

Henry avers that she did not refuse to sign an ARP on behalf of Plaintiff but rather, she was not authorized to sign the ARP, and was simply following procedure. *Id.*, Ex. 9. Donoway avers that he never received an ARP from Plaintiff, nor did he refuse to sign one. *Id.*, Ex. 10.

Adams received an ARP from Plaintiff on February 2, 2013, concerning allegations against Tavers. *Id.*, Ex. 7. Adams interviewed Plaintiff and inspected the cell door but did not observe any writing on the door. Adams avers that he did not attempt to discourage or intimidate Plaintiff from filing a complaint and at no time attempted to intimidate Plaintiff by threatening a transfer from protective custody. *Id.* The ARP was processed through ARP procedures and given to Donaway.

Donaway, the assigned housing lieutenant for Unit 5, attempted to informally resolve Plaintiff's complaints regarding Tavers. *Id.*, Ex. 11. Donoway met with Plaintiff who stated, "we can end this; I will sign off the ARP if you put $700.00 in my institution account, $200.00 in my commissary account, a single cell, extra ice and toilet paper daily." Donoway advised Plaintiff he was on a waiting list for a single cell and that extra ice and toilet paper would be accommodated if medically documented. Plaintiff was further advised that no money would be added to his account. Plaintiff stated that he did not care about ARPs and Inmate Grievance Office (IGO) hearings but would take the matter to federal court. Donoway states that he did not use fear tactics or try to intimidate Plaintiff from withdrawing the ARP. *Id.*

E. Transfer

Andrea Randall, case manager and transfer coordinator at ECI, initiates all transfers of ECI inmates to other institutions. On March 9, 2012, Plaintiff was transferred from Western Correctional

6

Institution (WCI) to ECI's protective housing unit. Plaintiff wrote to Randall in the beginning of 2013 and requested a single cell. ECI is not equipped with single cell protective custody housing. In April, 2013, MCI-H opened a protective custody unit which is comprised of single cells. MCI-H made available to ECI several protective custody cells for those who needed or wanted a single cell. Randall placed Plaintiff on the transfer list and he was transferred, along with other ECI inmates, to the MCI-H protective custody unit on April 4, 2013. *Id.* Randall avers that none of the correctional officers or other staff have access so the transfer list, nor can they make transfers from the list. Moreover, the transfers do not have to be approved by the Warden and in fact Randall did not consult with the Warden before transferring Plaintiff to MCI-H. *Id.*

F.    IGO

Scott Oakley, Director of the Inmate Grievance Office, avers that Plaintiff filed four grievances with the IGO since January 1, 2013. *Id.*, Ex. 13. IGO Nos. 20130438 and 20130439, filed March 18, 2013, concerned, respectively, Plaintiff's complaints that during Ramadan he could not take his morning medication because it was not delivered until during the fasting period and he was not provided ice or cold water during Ramadan. The grievances were administratively dismissed on April 22, 2013, because Plaintiff submitted his initial ARP complaints months after the events complained of. IGO No. 20130772, filed May 6, 2013, concerned Plaintiff's complaints that on January 27, 2013, Tavers placed his hands on Plaintiff's left shoulder and said: "I can feel it." At the time of the filing of the dispositive motion, this grievance was pending review. On May 13, 2013, Plaintiff submitted IGO No. 20130835 concerning the unavailability of showering on Fridays before services. This grievance was also pending preliminary review. *Id.*

Standard of Review

A.    Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require Defendant to establish "beyond doubt" that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 561-62 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 562. The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979).

In reviewing the Complaint in light of a motion to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the Plaintiff. *See Venkatraman v. REI Sys., Inc.,* 417 F.3d 418, 420 (4th Cir. 2005); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless,

the Complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. Thus, a Complaint need only state "enough facts to state a claim to relief that is plausible on its face." *Id.* 570.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

B. Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the

summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Analysis

A.  Exhaustion

Plaintiff has failed to exhaust his administrative remedy process. The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § ] 1983 ... or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo*, 548 U.S. 81, 8485 (2006). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Jones v. Bock*, 549 U.S. 199, 211 (2007). Consequently, his claims can be dismissed for failure to exhaust administrative remedies.

B.  Respondeat Superior

Plaintiff's complaint against Defendant Green is based solely upon the doctrine of *respondeat superior,* which does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001), citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was

engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Plaintiff has pointed to no action or inaction on the part of Defendant Green that resulted in a constitutional injury, and accordingly, his claims against the Warden shall be dismissed.

C.    Eleventh Amendment

The Eleventh Amendment immunizes states from suit brought in federal court absent waiver from the state or a clear congressional exercise of its power under the Fourteenth Amendment. *See Will v. Michigan*, 491 U.S. 491 U.S. 58, 66 (1989). The State of Maryland has not expressly waived its immunity under the Eleventh Amendment to such suits. The individually-named Defendants, to the extent they are sued in their official capacity, are entitled to dismissal given that suit against a state officer in his official capacity is the equivalent to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). Thus, Defendants are immune from suit in federal court in their official capacity and any claim against them stated as such is subject to dismissal.

D.    Religious Claims

Section 3 of Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc–1 (a) provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest.

12

Under RLUPIA, Plaintiff has the burden of persuasion as to whether the government action substantially burdens his exercise of religious freedom. *See Adkins v. Kaspar*, 393 F.3d 559, 567 n. 32 (5th Cir.2004); *Civil Liberties for Urban Believers v. Chicago*, 342 F.3d 752, 760 (7th Cir. 2003). Once a substantial burden is established, the government bears the burden of persuasion that its practice is in furtherance of a compelling government interest and is the least restrictive means of furthering that interest. *See Adkins*, 393 F.3d at 567 n. 32. RLUIPA does not give prisoners an unfettered right to religious accommodation. Rather, the statute mandates "due deference to the experience and expertise of prison and jail administrators." *Lovelace v. Lee*, 472 F.3d 174, 210 (4th Cir.2006), quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).

Prior to RLUIPA, courts applied the First Amendment "deference" analysis found under *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987) and *Turner v. Safley*, 482 U.S. 78, (1987). These cases held that incarceration leads to a limitation on many rights and privileges as may be warranted by valid penological considerations, *see O'Lone*, 482 U.S. at 348, 352, and that a prisoner's right to free exercise of his religion must give way to regulations that are "reasonably related to legitimate penological interests." *Id.* at 349; *cf. Turner*, 482 U.S. at 89.

After reviewing the claims and facts in the light most beneficial to Plaintiff, the Court finds he has failed to meet his burden of persuasion. Plaintiff must show that his claim is rooted in religious belief and not in "purely secular" concerns. *See Wisconsin v. Yoder*, 406 U.S. 205, 215, 216 (1972). It is well settled that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. Ind. Empl. Sec. Div.* 450 U.S. 707, 714 (1981). However, beliefs which are philosophical and personal, rather than religious, do not rise to the demand of the religion clause. *Yoder*, 406 U.S. at 205.

Indeed, the matters complained of by Plaintiff do not violate his First Amendment rights. The provision of medication during Ramadan complied with Islamic law in that under Islamic law, Plaintiff may take his medication without breaking his fast. Further, the policy of distributing medication at certain times is rationally related to the staffing and institutional security concerns of the institution.[3] Additionally, ice and ice water were provided throughout the day and at the evening meal. Plaintiff was free to partake of same throughout the day. Plaintiff offers no evidence that being provided ice water is a tenet of his religion and not a purely secular concern. Further, the limitation on showers on Fridays does not constitute a substantial burden on Plaintiff's exercise of his religious practices as the shower taken on Thursday is sufficient, under Islamic law, to satisfy the requirement of ritual cleansing before Friday services. Moreover, Plaintiff has access to running water in his cell with which he may cleanse himself prior to the Friday services. The limitations placed on showering on Fridays does not impair Plaintiff's ability to comply with the religious requirements of ritual cleansing. Lastly, the location of Islamic services in Housing Unit 5 complies with the requirements of Islam and addresses the safety and security concerns of the institution as well as the program limits for providing religious activities.[4] Plaintiff offers no evidence that providing a quiet place free from the intrusion of the noise of other inmates is a tenet of his religion rather than a secular concern. Plaintiff has failed to show that his free exercise rights are substantially burdened.

---

[3] Plaintiff indicates that other institutions provide for an early medication line which begins before the first "chow line" for Muslims who are fasting. ECF No. 25. He further indicates that medical staff come to the housing unit to distribute insulin and perform blood draws between 2:30 a.m. and 3:30 and indicates his opinion that the nurse could bring the medication to the Muslims who are fasting at that time. ECF No. 25. How other institutions are managed does not refute Defendants' assertions that medication distribution is managed by contractual staff and done so in order to facilitate institutional security concerns.

Plaintiff's complaints about interference with mail order items, denial of library access, and denial of medical care, contained in his reply, are not properly before the Court and will not be considered. ECF No. 25.

[4] Plaintiff indicates that on "cross containment" days, recreation is being held in an area below the congregate prayer service and the noise is disruptive. ECF No. 25.

E.   Equal Protection

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To show that his equal protection rights were violated Plaintiff must demonstrate that he was treated differently than similarly situated inmates and the discrimination was intentional or purposeful. *See Williams v. Bitner*, 307 Fed. Appx. 609, 611 (3rd Cir. 2009). If the discrimination was based on a Plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, Plaintiff must show that the discrimination did not bear a rational relationship to a legitimate government purpose. *See Cleburne*, 473 U.S. at 440-42.

The key to an equal protection claim here requires a showing "that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett*, 137 F.3d 1027, 1051 (8th Cir. 1998). Accordingly, "while a prisoner does not forfeit his constitutional right to equal protection by the fact he has been convicted of a crime and imprisoned, prisoner's claims under the equal protection clause ... must still be analyzed in light of the special security and management concerns in the prison system."[5] *Morrison v. Garraghty*, 239 F. 3d 648, 655 (4th Cir. 2001), citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977) ("There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.") The "differences" in treatment between Muslim prisoners and other prisoners in terms of location of religious services in Housing Unit 5 arises not

---

[5] A prisoner's rights under the Constitution must not be inconsistent with his or her status as a prisoner. *See Hudson v. Palmer*, 468 U.S. 517, 523 (1984). Even when strict scrutiny would otherwise be applicable to a given policy, because of the exigencies of prison administration, regulations must only be reasonably related to a legitimate penological interest. *See Thornburgh v. Abbott*, 490 U.S. 401, 409-10 (1989).

out of Defendants' intentional discriminatory acts: rather, the provision of Islamic services comports with Islamic law and is within the safety, security and program limits for providing religious activities at ECI. No discriminatory animus is shown, and this claim fails as a matter of law.

F.      Harassment/Retaliation Claims

In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim). Plaintiff offers nothing in support of his claim other than self-serving conclusory averments. "[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Verbal abuse of inmates by guards, including aggravating language, without more, states no constitutional claim. *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff laughed at inmate and threatened to hang him); *Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) (racial slurs); *Cole v. Cole*,633 F.2d 1083, 1091 (4th Cir. 1980) (no harm alleged from claimed verbal harassment and abuse by police officer). Accordingly, Plaintiff's allegations concerning verbal harassment fail to state a claim. Likewise, Plaintiff's allegation that supervisory officials failed to take corrective action as to the officers' unprofessional conduct fails to state a constitutional claim.

Moreover, there is nothing in the record to suggest that Defendants acted in the manner alleged. Plaintiff's ARPs regarding religious threats was investigated. No evidence of "Jesus" written on Plaintiff's cell door was found. Additionally, Plaintiff's claim that he was transferred in

16

retaliation is belied by the record. Plaintiff initiated his transfer by requesting single cell protective custody status.[6] When the single cell became available case administrators effected the transfer. None of the named tier officers had anything to do with placing Plaintiff on a transfer list or approving the transfer. Additionally, Defendants aver that they did not threaten Plaintiff as alleged.

"In the prison context, we treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3de 1310, 1317 (4th Cir. 1996). Plaintiff cannot prevail on this claim.

G. Administrative Remedy Process

To the extent the Plaintiff alleges there were problems with the processing of his administrative remedy requests, his claim likewise fails. While the long standing rule has been that prisoners have no constitutional right to participate in an institutional grievance procedure, *see Adams v. Rice*, 40 F. 3d 72, 75 (4th Cir. 1994), with the passage of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), the issue is less clear. The PLRA requires exhaustion of administrative remedies before a federal action concerning prison conditions may be filed by a prisoner. The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Further clarification regarding exhaustion as a pleading

---

[6] Plaintiff indicates that contrary to Randall's affidavit single protective custody cells are available at ECI. ECF No. 25. He denies requesting the transfer. Nonetheless, prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515 U.S. 472 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally

requirement was announced by the Fourth Circuit in *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674 (4th Cir. 2005), wherein the court held, "an inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant." *Id.* at 681. To the extent that a prisoner's attempts to exhaust the administrative remedy process are thwarted by prison officials' misconduct, that evidence may be presented in response to the affirmative defense. *Id.* at 682. Thus, an inability to access the administrative remedy procedure based on an alleged refusal by prison officials to enforce the rules governing the process does not run afoul of the due process clause. Assuming, *arguendo*, that the Defendants did not satisfactorily investigate or respond to the Plaintiff's remedy requests in a timely fashion, Plaintiff's claim fails as he has not alleged, much less demonstrated, any injury as a result of the alleged failure to investigate ARPs.

## Conclusion

For the reasons stated, Plaintiff's complaint against Warden Green shall be dismissed. Summary judgment is granted in favor of Defendants Lieutenant Walter Donaway, Lieutenant Henry Landon, Sergeant Donald Adams, CO II Antonio Henry, and CO II Danny R. Tavers.[7] A separate Order shall be entered in accordance with this Memorandum Opinion.

Date: 10/29/2013                              /s/
                                              RICHARD D. BENNETT
                                              UNITED STATES DISTRICT JUDGE

---

protected liberty interest). Plaintiff does not have a right to be housed in a particular prison or participate in a particular program, and these allegations must be dismissed.
[7] Having found no constitutional violation, the Court need not address Defendants' claim of qualified immunity.